# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                            No. CR 16-3068 JB

JAMES EDWARDS,

     Defendant.

## <u>UNSEALED MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court on the United States' Sealed Motion in Limine to Exclude Katherine[2] [sic] Armijo's Testimony, filed May 26, 2017 (Doc. 60)("Motion"). The Court held a hearing on June 22, 2017. The primary issue is whether the Defendant, James Edwards, should be allowed to call Catherine Armijo to testify about a conversation that she had with V.S., even though Plaintiff United States of America argues that the testimony is hearsay, impermissible expert testimony, and highly prejudicial under rule 412 of the Federal Rules Evidence. <u>See</u> Motion at 1. The Court will grant in part and deny in part the United States' Motion, because, while Armijo's testimony would be hearsay, some of her testimony falls within an exception to the hearsay rule.

---

[1] In its Sealed Memorandum Opinion and Order, filed August 17, 2017 (Doc. 107)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO. <u>See</u> Sealed MOO at 1 n.1. The Court gave the parties fourteen calendar days to provide notice of any proposed redactions. <u>See</u> Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in its unsealed form.

[2] Catherine Armijo's name is spelled correctly in the transcript of the recorded interview, <u>see</u> Doc. 60-1, but is subsequently misspelled in the Motion, <u>see</u> Doc. 60.

## FACTUAL BACKGROUND

The Court considers it appropriate to first provide some background facts.  The Court takes most of its facts from the Redacted Indictment, filed July 12, 2016 (Doc. 2)("Indictment"), and therefore recognizes these facts largely derive from the United States' version of events.  The Court provides these facts to contextualize Edwards' Motion and emphasizes that Edwards is presumed innocent.

The United States charges Edwards with aggravated sexual abuse, in violation of 18 U.S.C. §§ 1153, 2241(a), and 2246(2)(B).  See Indictment at 1.  The Indictment identifies both Edwards and the alleged victim of the aggravated sexual abuse, V.S., as Indians, and charges that the aggravated sexual abuse occurred in Indian Country, namely, in Cibola County.  See Indictment at 1.  On July 12, 2016, a grand jury charged Edwards with unlawfully and knowingly engaging in a sexual act by force.  See Indictment at 1.  The Indictment states that the act occurred between the dates of December 25, 2014, and January 31, 2015.  See Indictment at 1.  The Indictment identifies the sexual act as contact between Edwards' mouth and V.S.' vulva. See Indictment at 1.

## PROCEDURAL BACKGROUND

The Court will lay out the procedural history of the Motion, response, and testimony concerning the Motion.  The United States filed the Motion on May 26, 2017.  The Court held a hearing on June 22, 2017.  During the hearing, the parties mostly stuck to their briefing.

### 1.    The Motion.

The United States asks the Court to exclude Armijo's testimony, "because it is hearsay, impermissible expert testimony, and highly prejudicial under Fed. R. Evid. 412."  Motion at 1. The United States identifies Armijo as a potential witness from Edwards' Witness List (Doc. 54)

and states that Armijo's testimony concerns "alleged statements regarding the victim. . . [and] Ms. Armijo's statements would only serve to confuse the jury.  Moreover, Ms. Armijo has not formally been disclosed as an expert on traditional healing practices to this Court or to the United States pursuant to Fed. R. Crim. P. 16(b)(1)(C)."  Motion at 1.

The United States next provides its version of the background facts.  <u>See</u> Motion at 1. The United States asserts that Edwards, a medicine man within his community whom members of the community respect to administer traditional healing rubs, contacted his mouth to V.S.' vulva during one of the rubs.  <u>See</u> Motion at 1-2.  The United States then states that Bureau of Indian Affairs Special Agent Marcelino ToersBijns interviewed Edwards' sister, Armijo, as part of his investigation into Edwards.  <u>See</u> Motion at 2.  The United States then asserts that Armijo "made statements regarding prior conversations she allegedly had with the victim and statements about Ms. Armijo's experience with sexual contact during her own traditional healing ceremonies.  The United States anticipates that Ms. Armijo will testify on these issues on behalf of the Defendant at trial."  Motion at 2.

> The United States specifically seeks a ruling concerning Armijo's statements;
>  "about [the alleged victim's] use of marijuana and any perceived addiction to marijuana. The allegation that [the alleged victim] calls 'rape' on men when they don't give [her] what [she] wants, and Ms. Armijo's statements about the acceptance of female nudity and practice of touching of female [genitalia] during a traditional healing ceremony."

Motion at 2.

The Court recites the exchange between Armijo and ToersBijns in full, because of its pertinence:

> Katherine [sic] Armijo: Okay? But she goes, "Oh, if I ever want to get even with him, I'll just call rape."  And I was like, "You are sick." And I told James, "Don't ever be alone with her. Don't ever, you know, doctor her alone. Don't ever -- anything alone with that girl. She's not right."

Motion at 2 (quoting Recorded Interview of Catherine Armijo Re: James Edwards Sr.

(taken April 7, 2015), filed June 21, 2017 (Doc. 60-1)("Armijo Interview").

> Katherine [sic] Armijo: And she goes, "Yeah," she goes, "I'll get even with him. I'll just -- I'll just -- I'll just cry rape." And I said, "Why would you do that? They could go [sic] to prison for that. You know, why would you do that?" And she goes, "Because they'll give me what I want eventually, you know." And she says," I'll drop all the charges." She said, "I've done it before." I was like, "You're sick." I was like, "You're sick." And -- and I told James, you know, I -- back then I said, "James, she's -- you know, she said she would pull something like that if" -- I said, "Did she ask you for anything? Did she want something from you?"

Motion at 3 (quoting Armijo Interview).

Armijo contends: "I said, did she ever want anything from you? And he said, yeah. She wanted smoke. I said, and you didn't give it to her? And he goes, no. And he goes that's why -- I told him, that's why you're getting this." Motion at 3 (quoting Armijo Interview).

> Katherine [sic] Armijo: And she said, "Oh, if they don't give me what I want or they don't do what I want" -- you know.
>
> SA ToersBijns: Men? Men?
>
> Katherine [sic] Armijo: Men in general. She said, "I just call -- I just call rape. I just scream rape," she said. And I was like, "Holy mother" -- You know, and I told James, "Don't ever doctor this girl." That was back then, you know, in 2010, '11, something like that. I said, "Don't ever doctor this girl alone. Don't ever be alone with this girl."

Motion at 3 (quoting Armijo Interview).

> Katherine [sic] Armijo: And she had taken off her clothes [sic] and was just lying [sic] on the bed.
>
> SA ToersBijns: Okay.
>
> Katherine [sic] Armijo: And he went in, and then he like turned around and walked right back out and he was laughing. And I had already gotten dressed. I come -- I came out of the room. The rooms were like right across from each other, and I came out of the room and I go, "What's so funny?" And he goes, "She's naked in there." I was like, "What?" He goes, "She naked." I said, "I told her the women change in here." He goes, "She went in there." And I was like,

"Don't go in there." I told my boys, "Don't go in there."

SA ToersBijns: Okay. Did he – did James go back in there?

Katherine [sic] Armijo: No. No, he did not. No, he did not. No. He -- he just was like -- you know, he told me, he goes, "She's nuts." And I was like, "You think?" He never went back in there. He never touched her. I know. I was there.

SA ToersBijns: Did you ask him if he touched her or anything?

Katherine [sic] Armijo: No.

SA ToersBijns: No?

Katherine [sic] Armijo: There was no point. I mean, he came -- the door opened, he walked in for a second, and came right back out. There wasn't enough time --

SA ToersBijns: Okay.

Katherine [sic] Armijo: -- for him to go in there and do anything to her. You know. So, no, no, he wouldn't have done that.

SA ToersBijns: Okay. Anything else that night?

Katherine [sic] Armijo: That I can remember, not -- not -- just that she really wanted to go. She was desperate for her weed. I was hoping this is what would help, you know.

SA ToersBijns: Um-hmm.

Katherine [sic] Armijo: I was really hoping that would help. And she really wanted to go, so we -- I took her and -- and that's when she had said -- I was driving her –

SA ToersBijns: Okay.

Katherine [sic] Armijo: -- to where she wanted to go, and that's when she had said about that, "I'll -- I'll -- you know, if they don't do what I want, I'll just -- I just call rape."

SA ToersBijns: Okay. I thought you said that she said that back when you first met her?

Katherine [sic] Armijo: Yeah. And it was -- it was during that time. She -- she had come to my house -- well, no, I met her at Snaky's house. You're right, that's wrong. Because she had said it at my house. It was at my house. It's been a long

time.

SA ToersBijns: (Inaudible) sweat?

Katherine [sic] Armijo: I'm sorry.

SA ToersBijns: That's okay.

Katherine [sic] Armijo: I'm not trying to be dishonest with you. I really am not.

SA ToersBijns: Okay.

Katherine [sic] Armijo: I'm trying to be honest with you and I'm trying to remember, but that's been five years. And in five years, I went through a nightmare you couldn't believe.

SA ToersBijns: Okay. So -- but she only said that once to you?

Katherine [sic] Armijo: Yeah.

SA ToersBijns: Correct?

Katherine [sic] Armijo: She said that once.

SA ToersBijns: About getting even with men, she'll call rape?

Katherine [sic] Armijo: Yeah. If she doesn't get what she wants from a man, she'll -- she'll scream rape. That's what she does.

SA ToersBijns: So does your memory recall now that it was probably in the car or was it when you met her at the house?

Katherine [sic] Armijo: No, it was in the car. It was definitely in the car.

SA ToersBijns: So the house is wrong?

Katherine [sic] Armijo: Because it was -- yeah, the house is wrong --

SA ToersBijns: Okay.

Katherine [sic] Armijo: -- and I'm sorry. I'm sorry.

SA ToersBijns: That's okay.

Katherine [sic] Armijo: It was in the car, because I was dropping her off at some friend's house. She was trying to go get -- she was trying to score.

Motion at 3-5 (quoting Armijo Interview).

> SA ToersBijns: And the recent call before Easter when he called you and said, "A police officer may come," he didn't give no details, have you ever talked about him and [the alleged victim] before?

> Katherine [sic] Armijo: No.

> SA ToersBijns: No?

> Katherine [sic] Armijo: No.

> SA ToersBijns: Okay.

> Katherine [sic] Armijo: He did mention way back to -- about a month ago, I said, "What happened?" I asked him, "What happened?" And he said, "All I did was rub her down." And I said, "Were you doctoring her?" And he said, "Cat, the only mistake I made was not taking cornmeal." And I said, "You don't ever touch anybody without cornmeal or somebody in that room, ever." I said, "They've warned you about that."

> SA ToersBijns: Why did they warn him?

> Katherine [sic] Armijo: Because women do this. Women will do this.

> SA ToersBijns: Okay.

> Katherine [sic] Armijo: Okay? And that it's -- all medicine men. The medicine men up north, they don't doctor anybody without somebody in the room. They don't. They just don't. Especially when it requires hands-on. And when they do hands-on -- and I've been doctored by him. My -- I doctored by my father head to toe. I never felt anything violated or anything like that because I knew what was happening. You know, I knew what was being done. I knew what had to be done.

> SA ToersBijns: Okay.

> Katherine [sic] Armijo: So --

> SA ToersBijns: So -- well, let me ask you: When you got doctored by your brother, is it like a rub -- rub down?

> Katherine [sic] Armijo: Yeah.

> SA ToersBijns: Okay.

Katherine [sic] Armijo: Yeah.  Well, they touch you, yeah.  They -- they do, yes.

SA ToersBijns: Yeah.  Like a massage?

Katherine [sic] Armijo: Well, yeah, kind of like that, yeah.

SA ToersBijns: Okay.  And you're clothed when that happens?

Katherine [sic] Armijo: No.

SA ToersBijns: No?

Katherine [sic] Armijo: I have my underwear on.

SA ToersBijns: Okay.

Katherine [sic] Armijo: I always have my underwear on, yeah.

SA ToersBijns: Okay, okay.  So that's something normal?

Katherine [sic] Armijo: Yes.

SA ToersBijns: Okay.  Okay.  I'm sorry, I don't know a whole lot about that.

Katherine [sic] Armijo: Yeah.  Oh, okay.

SA ToersBijns Okay.

Katherine [sic] Armijo: Yes, no, that's perfectly normal.

SA ToersBijns Okay, all right.  What about totally nude, would that be normal too?

Katherine [sic] Armijo: I've been nude in the sweat lodge.

SA ToersBijns: Okay, okay.

Katherine [sic] Armijo: And that is normal.

SA ToersBijns: Okay, okay.

Katherine [sic] Armijo: In the Acoma sweat lodge.  In Sioux sweat lodge, you're covered from neck to feet, arms, everything.  They don't allow that.

SA ToersBijns: But in Acoma sweat lodge, they're --

Katherine [sic] Armijo: It's different.

SA ToersBijns: It's different.

Katherine [sic] Armijo: It's different.

SA ToersBijns: Okay. So if there's going to be a rub down in Acoma --

Katherine [sic] Armijo: Uh-huh.

SA ToersBijns: -- and if the female feels comfortable, they can be totally naked?

Katherine [sic] Armijo: Yes. And they tell them, "If you're not comfortable, don't."

SA ToersBijns: Okay.

Katherine [sic] Armijo: "Don't," you know -- you know, you can keep -- but they always ask. You know, he always, "Is it okay if I – can we remove your shirt? Are you comfortable with that?" I was always asked. "Yeah, I'm fine with that. I know what's going on," you know. I'm fine with that, you know.

SA ToersBijns: Okay.

Katherine [sic] Armijo: I had uterine cancer one time, and my father had to insert a tube into my vagina to blow the hot air in there. It got rid of the cancer. I didn't care what was going on, because the doctorings are different in the different places. I couldn't get to South Dakota so I went there. The doctorings are different.

SA ToersBijns: Okay, okay. And during the rub, is there any touching of the genitalia?

Katherine [sic] Armijo: There can be depending on what is going on with the person.

SA ToersBijns: What about the vaginal area, what would be something that would prompt?

Katherine [sic] Armijo: Cancers, uterine cancers, ovarian cancers. A lot of times, too -- see, the belief system, if you're not familiar with the belief system, a woman's power is between her legs. Okay? And that power can be very positive or very negative. Sometimes they'll tell them, "I need to adjust this and it's -- I'm going to touch here. Is that a problem?" You know, and it will realign because right now it's negative -- or it's -- you know, if it's positive, they usually don't ask. They don't touch. But the belief system is that the power is between the legs,

a woman's legs. And a woman is not allowed to step over anything, especially sacred items. She -- when a woman is picking medicine, she has to be on her hands and knees. She can't be on -- you know, up where she can step over a medicine. So there's -- there's -- you know,

SA ToersBijns: Okay.

Katherine [sic] Armijo: -- a reason for everything.

SA ToersBijns: Okay. And any touching of the mouth or blowing of the vaginal area?

Katherine [sic] Armijo: I told you, he blew on mine.

SA ToersBijns: Okay.

Katherine [sic] Armijo: Yeah, it happens.

SA ToersBijns: I'm sorry.

Katherine [sic] Armijo: Yes, it happens.

SA ToersBijns: Okay, okay. All righty. And when that happens, there should be no arousal by the giver, correct? By the medicine man?

Katherine [sic] Armijo: I never had any. I never saw any.

SA ToersBijns: But -- but there should be none?

Katherine [sic] Armijo: Humans are humans. Okay?

Motion at 6-9 (quoting Armijo Interview).

The United States then asserts that Edwards "has not provided actual notice to the United States, pursuant to Fed. R. Crim. P. 16(b), that he intends to call Ms. Armijo to testify about her knowledge and experience with traditional healing ceremonies involving contact with the female genitalia." Motion at 9. The United States, additionally, argues that Edwards has not provided any reciprocal discovery and that the United States must, therefore, "guess what Ms. Armijo [will] offer at trial." Motion at 9. The United States, based on its speculation, then asks the Court to exclude Armijo's testimony as hearsay, impermissible expert testimony, and highly

prejudicial statements under rule 412 of the Federal Rules of Evidence.  <u>See</u> Motion at 9.

The United States made its argument by first quoting rule 702 of the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Motion at 10 (quoting Fed. R. Evid. 702).  The United States emphasizes <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993), and the court's gate-keeper function.  <u>See</u> Motion at 10 ("In this gate-keeper role, prior to the admission of expert testimony, the court must assess the reliability of the proposed expert testimony and ensure that any and all scientific testimony is not only relevant, but reliable."); <u>id.</u>  ("This gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts.")(internal quotation marks and citation omitted).

The United States maintains that Armijo's testimony is intended "solely to bolster his defense at trial and to diminish the damage of his incriminating statements."  Motion at 10.  The United States argues: "In other words, Defendant seeks to use Ms. Armijo's testimony to bolster his credibility before the jury."  Motion at 10.  The United States then asserts that "such testimony is irrelevant and improper and the Court should exclude Ms. Armijo from testifying."  Motion at 10.  The United States emphasizes that, even if this Court allows Armijo's testimony under rule 702, the Court should exclude the testimony pursuant to rule 403 "as the danger of unfair prejudice to the United States substantially outweighs any nominal probative value this

testimony may have." Motion at 10. The United States, switching gears, then briefly returns to rule 702:

> In anticipation of Defendant calling Ms. Armijo as a quasi-expert on traditional ceremonies involving females, first and foremost, without the production of a report or summary of opinion, Defendant has failed to meet Rule 702's requirements. The lack of a summary simply violates the admissibility threshold contained in Rule 702 and it fails to comply with Fed. R. Crim. P. 16(b)(1)(C) regarding defense experts. Secondly, the defense has failed to timely identify her expert(s) and produce qualifications and reports, all in violation of the Discovery Order (Doc. 12) entered in this cause on July 18, 2016.

Motion at 11.

The United States argues that the Court should exclude Armijo's testimony as a matter of law, because "Armijo's proposed testimony is irrelevant and infringes on the jury's province to determine the facts and to assess credibility. Defendant's attempt to use Ms. Armijo to bolster his defense is contrary to firmly established Tenth Circuit law." Motion at 11. The United States employs <u>United States v. Adams</u>, 271 F.3d 1236 (10th Cir. 2001), to analogize:

> [T]he defendant was found guilty of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). At trial, the government introduced a series of incriminating statements made by the defendant following his arrest. Four days prior to trial, the defendant disclosed to the government a psychological report assessing the defendant. The government immediately moved to exclude the report, first, because the substance of the report was inadmissible and, second, due to its untimeliness. The district court sustained the government's motion. On appeal, the Tenth Circuit addressed the district court's rulings on both issues. It first agreed that the district court did not abuse its discretion in excluding the report based upon timeliness. More important to the current case, however, the circuit court affirmed the district court's decision to exclude the report based upon its substance.
>
> The defendant in Adams sought to introduce the psychological report in an effort to diminish the credibility of the defendant's post-arrest statements. In fact, in his briefing to the Tenth Circuit, the defendant specifically stated that the report showed Adams' neurocognitive impairment and dependent personality structure and supports the possibility the statements he gave to police were false. In its analysis, the Court of Appeals frankly acknowledged that a blanket exclusion of evidence regarding the circumstances of a confession precludes a fair trial. However, it also noted that, the credibility of witnesses is generally not an

appropriate subject for expert testimony.

The Tenth Circuit went on to hold that a district court may exclude evidence related to the credibility of a confession for a variety of reasons. First and foremost, expert testimony that does nothing more than vouch for the credibility of a witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not assist the trier of fact as required by Rule 702. Second, a proposed expert's testimony that a witness is lying or telling the truth could exceed the scope of the expert's specialized knowledge and would result in the expert simply informing the jury to reach a particular conclusion. Finally, the Tenth Circuit explained that allowing the testimony of an impressively qualified expert on the credibility of other witnesses is prejudicial and unduly influences jurors and should be excluded pursuant to Rule 403.

In affirming the exclusion of the psychological report by the district court, the [United States v. Adams, 271 F.3d 1236 (10th Cir. 2001),] court reviewed the report and found that it was little more than a professionally-trained witness testifying that, based upon his history, Mr. Adams is the type of person who would have lied about his involvement to the police. The circuit court concluded that the report did little more than vouch for the credibility of another witness and thereby encroached upon the jury's vital and exclusive function to make credibility determinations.

Motion at 11-13 (internal quotation marks and citations omitted).

The United States then compares Armijo's testimony to the expert testimony that the defendant in United States v. Adams, 271 F.3d 1236 (10th Cir. 2001), intended to introduce: "Similar to the Adams case, it is believed that Defendant seeks to have Ms. Armijo testify as to Defendant's cultural background, traditional role in the community, and cultural practices that allow him to blow into a woman's vagina for purposes of traditional healing." Motion at 13. The United States then argues:

Ms. Armijo is not a medicine woman, traditional healer, psychologist, or expert on substance abuse addiction. This is the exact type of testimony that encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore will not assist the trier of fact as required by Rule 702. Indeed, it will serve only to vouch for the Defendant's credibility and will not allow the jury to make its own determination. Hence, this Court should exclude Ms. Armijo's testimony as a matter of law.

Motion at 13.  The United States subsequently returned to its unfair prejudice argument, in case "Ms. Armijo's testimony clears Rule 702 hurdle."  Motion at 13.

> [T]he Court should nevertheless exclude this testimony on the grounds that the unfair prejudice the United States would suffer as a result of its admission substantially outweighs any probative value the Defendant may gain by its introduction.  Ms. Armijo's testimony will essentially serve to tell the jury that the Defendant's criminal conduct is accepted traditional practice.  The potential prejudice the United States faces if her testimony is admitted by this Court far outweighs the value of her testimony.  Thus, this Court should exclude Ms. Armijo's testimony.

Motion at 13.  The United States then argues that the alleged statements V.S. made about rape are inadmissible hearsay.  See Motion at 13-14.

> Furthermore, reputation and opinion evidence is never admissible under Rule 412. United States v. Torres, 937 F.2d 1469, 1472 (9th Cir. 1991).  As the rule's text makes clear, in the limited circumstances in which evidence of a victim's sexual history is admissible at all, it is admissible only in the form of "specific instances of sexual behavior."  Fed. R. Evid. 412(b)(1)(A), (B).  Under Rule 403, evidence of such allegations against the victim are highly prejudicial.  As such, Defendant cannot introduce evidence that Jane Doe had a reputation for crying rape.  Ms. Armijo's basis testimony comes entirely from hearsay.  She repeats information from a conversation with the Defendant approximately one month prior to her interview and information she learned from Defendant regarding the time Jane Doe was at her house.  She did not see what occurred with regard to the incident in question in this case or any activity between the defendant and Jane Doe in her bedroom with regards to the time Jane Doe was in Ms. Armijo's home.

Motion at 13-14.  The United States concludes its motion by reiterating its requests that the Court exclude Armijo's testimony.  See Motion at 14.

## 2.  **The June 22, 2017, Hearing**.

The Court held a hearing on June 22, 2017.  See Transcript of Hearing taken June 22, 2017 (Doc. 82)("June 22 Tr.").  The United States requested to keep most, or preferably all, of Armijo's testimony out of trial on the grounds that she is not an expert in the field, and that she may try to "back door hearsay statements" about what occurred in the bedroom during the incident in Rio Rancho.  June 22 Tr. at 178:23-180:3 (Marshall).  The United States requested

that the Court exclude the testimony as hearsay, because of the nature of the comments to which Armijo could speak and the non-negligible risk that the comments came indirectly from Edwards. <u>See</u> June 22 Tr. at 180:3-11(Marshall). Additionally, the United States raised the issue that testimony about what the alleged victim told her would be hearsay that the Court should exclude on hearsay grounds or under the rape shield law. <u>See</u> June 22 Tr. at 180:12-18 (Marshall). The United States then raised concerns that the Court should exclude from trial Armijo's character attacks on V.S. <u>See</u> June 22 Tr. at 180:20-25 (Marshall). In the event that the Court allows discussion of the incidents at Armijo's home, the United States contended in the alternative that most of Armijo's preliminary interviews suggest that much of her testimony is based on hearsay. <u>See</u> June 22 Tr. at 180:25-181:11 (Marshall). The United States therefore concluded that the Court should exclude Armijo's testimony on those grounds. <u>See</u> June 22 Tr. at 180:25-181:11 (Marshall).

In response, Edwards stated that it is his intent to call Armijo to testify about the sweat that took place in Rio Rancho, but that he would not be calling her "to provide opinion testimony or explanations about Tribal or pueblo ceremonial rituals." June 22 Tr. at 181:17-25 (Ray). Edwards forecasted that he also would call Armijo to establish the relationship between Edwards and V.S. in the past, adding that she could offer personal knowledge of what had taken place at her home. <u>See</u> June 22 Tr. at 181:25-182:14 (Ray). Edwards stated that he would not attempt to use Armijo's testimony as a way to introduce the statements from Edwards to Armijo at her house about what he saw, but just to have Armijo offer her own account of events that she witnessed. <u>See</u> June 22 Tr. at 182:14-183:1 (Ray). Edwards also stated that he may elicit testimony under rule 608 to offer Armijo's opinion on V.S.' reputation and her character for truthfulness. <u>See</u> June 22 Tr. at 183:2-14 (Ray). Additionally, Edwards asserted that the

statement Armijo gave in her interview with the agent, where she speaks of V.S. making statements that she would "call rape" on a man if she was not getting what she wanted, should be able to come into evidence under a number of theories. June 22 Tr. at 183:15-22 (Ray). One of the theories that Edwards offered was rule 803(3), where a statement can be used to prove the state of mind of a witness, including a motive or a plan, which Edwards asserts goes to V.S.' "intent to lodge an accusation." June 22 Tr. at 183:22-184:4 (Ray). In response to the Court's question about the length of time having elapsed between the statement and the actual incident, Edwards stated that "it happened about two years before the events that are charged in this case." June 22 Tr. at 184:5-21 (Ray). Edwards asserted that it would be seeking testimony largely in line with the interview that Armijo gave to the agent where she recounted V.S.' statement, to which the Court questioned how it would fit within the rule 803(3) exception of the declarant's then existing state of mind. See June 22 Tr. at 184:23-187:13 (Ray). Edwards argued further:

> Ray: Well, Judge under 803(3), you know a statement of the declarant then exist state of mind such as motive intent or marks it seems that it indicates her sort of planning a way to behave in a certain situation, and you know something that's going to happen you know, and I understand what the Court is saying but I think that you know, this exception allows for somebody has a plan or intent to do something. But other than that, what I was also going to add is it's not necessarily, it's not necessary to even offer it for the truth of the matter asserted. And.

> The Court: But isn't it exactly what it's being afford[ed] for is the truth of the matter I mean you want the jury to believe that when she said she was going to scream rape if she didn't get what she wanted that's exactly what you want them to believe.

> Ray: Sure, and I believe that you know [the] exception applies to her plan to do just that and I understand what the Court is saying about you know does it have to refer to her state of mind at some point in time.

June 22 Tr. at 187:14-188:12.

The Court set aside the statement and inquired whether the United States had any further concerns. See June 22 Tr. at 188:13-17 (Court). The United States then raised concerns that

- 16 -

Armijo had a conversation with Edwards where he told her or alluded to the fact that he was being investigated. See June 22 Tr. at 188:18-22 (Marshall). Edwards affirmed that he would not attempt to elicit information about statements that Edwards made to Armijo. See June 22 Tr. at 189:16-22 (Ray). The United States renewed its objection to Armijo's testimony and noted how quickly she could drift into areas that would not be appropriate. See June 22 Tr. at 190:3-13 (Marshall). The United States accepted that, if the testimony was somehow related to the character or truthfulness of V.S., there would be no objection. See June 22 Tr. at 190:21-24 (Marshall). The United States reiterated, however, its concern that Armijo would somehow use derogatory terms to describe V.S. See June 22 Tr. at 190:24-191:2 (Marshall). The Court stated that it would instruct Armijo to leave her opinion about V.S. "being nuts or anything along those lines" out of her testimony. June 22 Tr. at 191:3-12 (Court). The United States reiterated its concern that Edwards would use Armijo's testimony to testify that Edwards told her about V.S. being naked on the bed after the sweat in Rio Rancho. See June 22 Tr. 191:15-20 (Marshall). Edwards conceded that, other than the statement regarding when V.S. had stated that she would "scream rape," the rest of the statement made to the agent would be "scripted out." June 22 Tr. at 191:24-192:6 (Ray).

The Court then inquired about Edwards' previous quote about the pueblo men's behavior. See June 22 Tr. at 192:8-10 (Court). Edwards affirmed that this statement went to V.S.' state of mind and her plan, in her statement about what all the men at Acoma are doing to the women. See June 22 Tr. at 192:11-20 (Ray). Edwards asserted that these statements were further evidence of V.S.' frame of mind and her intent to "bring the men of Acoma Pueblo down." June 22 Tr. at 193:3-11 (Ray). The Court stated that, if Edwards can cite an authority that finds a link to statements made years earlier, then the Court would take the rule 803(3) motion into

consideration. See June 22 Tr. at 193:12-25 (Court). The Court also recommended that Edwards include this theory in the response, which was not yet filed, or in a supplemental brief. See June 22 Tr. at 194:4-14 (Court). The United States again objected to the inclusion of the statement about V.S. crying rape, stating that the Court should exclude it, because of its prejudicial nature. See June 22 Tr. at 194:18-195:18 (Marshall). The Court again stated that there must be some cases or treatises to support a rule 803(3) conclusion that a statement that many years back would apply to V.S.' state of mind during the incident in question. See June 22 Tr. at 197:13-19 (Court). The hearing then continued with additional motions unrelated to the Motion. See June 22 Tr. at 197:20-226:6 (Court, Marshall, Moss, Ray).

3. **The Motion Response.**

After the hearing, Edwards responded in opposition to the Motion with Defendant's Response in Opposition to the United States' Sealed Motion to Exclude Katherine [sic] Armijo's Testimony, filed June 27, 2017(Doc. 66)("Response"). With the Court's permission, Edwards drafted and filed the Response after the completion of the June 22 Hearing. See June 22 Tr. at 194:4-14 (Court). Edwards begins his response by acknowledging: "The issue remaining for the Court to decide is whether to permit witness Katherine [sic] Armijo to testify that, on one occasion, the alleged victim stated that she would fabricate rape accusations and that she had done so before." Response at 1. When combined with his concession that he would not use Armijo as an expert witness during the June 27 hearing, Edwards therefore can argue regarding only the hearsay question of Armijo's testimony. See Response at 1.

Edwards first characterizes the United States' view of Armijo's testimony as inadmissible hearsay. See Response at 1. Edwards disagrees and contends that the statements "are highly probative of the alleged victim's intent and willingness to fabricate a rape accusation to coerce a

man to do something for her or give her something."  Response at 1.  Edwards then argues that

"the statements are admissible under multiple theories," but starts with rule 803(3).  Response at

1.  Edwards quotes rule 803(3), asserting that the Court may admit hearsay when it is "a

statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or

emotional, sensory, or physical condition (such as mental feeling, pain or bodily health)."

Response at 1 (internal quotation marks omitted).  Edwards then argues that, at the time V.S.

made the statements about fabricating rape, she "had the intent and emotional and mental

willingness to fabricate rape accusations to get her way from men, and she followed through with

that expressed intent and willingness with respect to Defendant."  Response at 1-2.  Edwards,

furthermore, argues:

> The passage of time does not undermine the applicability of the hearsay
> exception.  Rule 803(3) applies to statements that prove the declarant's emotional
> state and state of mind at the time of the utterance.  The passage of a few years
> does not undermine the relevance of the declarant's state of mind at the time the
> statements were made because an expressed willingness and intent to fabricate
> rape accusations as a tool to manipulate men, even if made a few years before the
> incident charged in this case, is highly probative of the declarant's continuing
> willingness, intent, and emotional capacity to make such fabrications.

Response at 2.  Edwards additionally asserts he "should be permitted to introduce the statements

pursuant to rule 613, as extrinsic evidence of a prior inconsistent statement."  Response at 2.

> To admit the statements, the Defense would confront Jane Doe about them
> on cross examination, thus giving her an opportunity to explain or deny them.
> If she denies the statements, then the Defense would be permitted, pursuant to
> rule 613, to introduce the statements through Katherine [sic] Armijo as prior
> inconsistent statements to impeach Jane Doe's character for truthfulness.
> Defendant therefore requests that the Court permit him to introduce the
> alleged victim's statements to Katherine [sic] Armijo that she would cry rape
> and that she had done so before.

Response at 2.

Edwards then provides background on the statements, generally. <u>See</u> Response at 2. Edwards says the statements result from an interview between Armijo and ToersBijns as part of the investigation. <u>See</u> Response at 2. Edwards asserts that the statements relate to a conversation between Armijo and V.S. which took place in approximately 2010 or 2011, and that V.S. expressed a readiness to manufacture rape accusations. <u>See</u> Response at 2.

> In one instance, according to Ms. Armijo, the alleged victim said: "Oh, if I ever want to get even with him, I'll just call rape." She further stated: "[Y]eah . . . I'll get even with him. I'll just -- I'll just -- I'll just cry rape." When asked why, according to Ms. Armijo, Jane Doe responded: "Because they'll give me what I want eventually, you know." When asked, "You do that," the alleged victim responded: "I'll drop all the charges. . . . I've done it before."

Response at 2-3 (internal citations removed). Edwards then reiterated that he seeks the statement's introduction, because the statements are "indicative of the alleged victim's state of mind at the time she made them, including her intent and mental and emotional willingness to fabricate rape allegations as a means of manipulating men." Response at 3.

Edwards then outlined his view of the law regarding rule 803(3). <u>See</u> Response at 3. Edwards acknowledges hearsay is generally inadmissible, "unless a federal statute, rule of evidence, or Supreme Court rule provides otherwise." Response at 3. Edwards next defines hearsay as, "a statement that . . . the declarant does not make while testifying at the current trial or hearing, and . . . a party offers to prove the truth of the matter asserted." Response at 3 (quoting Fed. R. Evid. 801(c)). Edwards then points to rule 803(3) as a recognized exception to the general prohibition he just outlined. <u>See</u> Response at 3.

> One long-standing exception allows for the admission of [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Response at 3 (quoting Fed. R. Evid. 803(3)).

Edwards draws attention to the Advisory Committee's guidance that "[e]xception paragraph (3) is essentially a specialized application of Exception paragraph (1), presented separately to enhance its usefulness and accessibility." Response at 3 (internal quotation marks and citations removed). Edwards acknowledges that "[e]xception (1) applies to a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Response at 3 (internal quotation marks and citation omitted). Edwards argues that the text of 803(3), however, is not so temporally limited.

> The text of 803(3), however, rather than being expressed in terms of a statement being made "immediately thereafter," uses the phrase "then existing," and it is reasonable to read this phrase as related to the time frame when the declaration is made -- in other words, the statement of the declarant's state of mind at the time the statement is made.

Response at 3-4 (quoting Federal Rules of Evidence 803(1), 803(2)). Edwards contends: "It is therefore fair to say that with hearsay exceptions related to present sense impressions and state of mind, the statement must be contemporaneous or very close in time to the existence of the condition or event being declared." Response at 4.

Edwards then argues: "Nevertheless, evidence of a declarant's state of mind at a particular time can be admitted to prove a past state of mind or a future one, or to prove that someone followed through with the intended act." Response at 4. Edwards then completes his view of the rule 803(3) law by quoting the Advisory Committee and arguing that a declarant's state of mind can be admitted to prove a past state of mind or future one. See Response at 4.[3]

---

[3] Edwards quotes the Advisory Committee:

The rule of <u>Mutual Life Ins. Co. v. Hillmon</u>, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), allowing evidence of intention as tending to prove the doing of the act intended, is of course, left undisturbed. See also <u>Brown v. Tard</u>, 552 F. Supp. 1341, 1352 (D.N.J. 1982)(explaining that hearsay statements reflecting a

## RELEVANT LAW REGARDING ADMISSIBLE EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, & 403). "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")). "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note). Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible. See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## RELEVANT LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice,

---

declarant's intentions or future plans are admissible to show that the intended act was subsequently performed. Brown v. Tard, 552 F. Supp. 1341, 1352 (D.N.J. 1982) and Edwards & Hanly v. Wells Fargo Sec. Clearance Corp., 458 F. Supp. 1110, 1118 n.2 (S.D.N.Y. 1978)(A statement of the declarant's present state of mind is admissible to prove a past state of mind in issue.)(citing United States v. DeCarlo, 458 F.2d 358, 364-65 (3d Cir.), cert. denied, 409 U.S. 843, 93 S. Ct. 107, 34 L. Ed. 2d 83 (1972), and McCormick on Evidence § 295, at 696 (2d ed. 1972)).

Response at 4-5(internal quotation marks removed).

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)). The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings. . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant.

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . . ").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

## RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert v. Merrell Dow Pharmaceuticals, Inc., trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide."  United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M.2011) (Browning, J.).  "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony is the product of a reliable methodology."  United States v. Gutierrez-Castro, 805 F.Supp.2d at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound."  United States v. Gutierrez-Castro, 805 F.Supp.2d at 1224.

1.      **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact
to understand the evidence or to determine a fact in issue, a witness qualified as

an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and

the trial court has broad discretion in deciding whether to admit or exclude expert testimony, <u>see</u> <u>Werth v. Makita Elec. Works, Ltd.</u>, 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

      **2.**        <u>**The Standard in**</u> **Daubert v. Merrell Dow Pharm., Inc**<u>.</u>

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.  <u>See</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. at 594-95; <u>Witherspoon v. Navajo Ref. Co.</u>, LP, No. 03-1160, 2005 WL 5988649, at 2 (D.N.M. July 18, 2005)(Black, J.)(citing <u>Dodge v. Cotter Corp.</u>, 328 F.3d 1212, 1221 (10th Cir. 2003)).  The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.  <u>See</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. at 594-95.  The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  <u>See</u> <u>Witherspoon v. Navajo Ref. Co.</u>, <u>LP</u>, 2005 WL 5988649 at 3 (citing <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136 (1997)).  The Tenth Circuit stated the applicable standard in <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable."  <u>Bitler v. A.O. Smith Corp.</u>, 391

F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . . ). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" Id. (quoting Daubert, 509 U.S. at 592 . . . ). In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid . . . ." Id. (quoting Daubert, 509 U.S. at 592—93 . . . ). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

397 F.3d at 883--84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case . . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharm., Inc., to non-scientific expert testimony. See 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharm., Inc., will not apply to all cases:

Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05–0619, 2006 WL 4060665 JB/DJS, at 11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595). "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at 11 (alterations)(and internal quotation marks omitted). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare Corp., 397 F.3d at 881. The Tenth Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances . . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d at 1206. The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington N.R.R. Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct

prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502–503.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623 JB/WPL, at 10 (Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez–Felix, 450 F.3d 1117, 1123 (10th Cir.2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F.Supp.2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  See Truck Ins.

Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3. **Necessity of Evaluating an Issue Under** Daubert v. Merrell Dow Pharm., Inc.

The restrictions in Daubert v. Merrell Dow Pharm., Inc. apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n. 11 ("Although the Frye[4] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n. 11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n. 11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's

---

[4]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed.R.Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

opinion is a relevant consideration in determining whether expert testimony is reliable. See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology, and in fact some courts have indicated their acceptance of it.").

## RELEVANT LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., No. CIV 10-0698 JB/RHS, 2013 WL 311846, at 13 (D.N.M. Jan.18, 2013)(Browning, J.)(citing Fed. R. Evid. 802). Under rule 801(c) of the Federal Rules of Evidence, "'[h]earsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including to impeach a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay.").

1. **Law Regarding Rule 803(1).**

Rule 803(1) provides an exception to the rule against hearsay for "[a] statement describing an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "By its own terms, application of Rule 803(1) has three distinct

requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question." United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994)(Korman, J.)(quoting Fed. R. Evid. 803(1)). "The present sense impression exception applies only to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures." Brown v. Keane, 355 F.3d 82, 89 (2d Cir. 2004). "The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication." United States v. Hawkins, 59 F.3d 723, 730 (8th Cir. 1995), cert. granted, judgment vacated on other grounds, 516 U.S. 1168 (1996). "The admissibility of spontaneous utterances -- one ground relied on by the state trial court -- was recognized by the Supreme Court over a century ago in Insurance Co. v. Mosley, 75 U.S. (8 Wall.) 397, 406-07, 19 L. Ed. 437 . . . (1869)." Martinez v. Sullivan, 881 F.2d 921, 928 (10th Cir. 1989).

### 2. Law Regarding Rule 803(3).

One of these exceptions, rule 803(3), excepts from the general bar on hearsay "[a] statement of the declarant's then existing state of mind [or] emotion." Fed. R. Evid. 803(3). Rule 803(3) permits the introduction of "hearsay . . . , even though the declarant is available as a witness," for a statement of the declarant's "[t]hen existing mental, emotional, or physical condition":

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3).

For the statement to qualify under the exception, it "must relate to the declarant's state of mind during" the incident in question. United States v. Netschi, 511 F. App'x. 58, 61 (2d Cir. 2013)("To admit statements of one's state of mind with regard to conduct that occurred . . . earlier as in this case would significantly erode the intended breadth of this hearsay exception.")(quoting United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991))(internal quotations omitted). This requirement is not to say that the statement must be said at the very moment of the incident, but for intent to be proved, it must be "contemporaneous" to the act. Mutual Life Ins. Co. of New York v. Hillmon, 145 U.S. 285, 295 (1892). To be contemporaneous and therefore admissible under the present state of mind exception, a statement must be "part of a continuous mental process." United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991). In addition to the requirements that the statement be contemporaneous to the incident at hand and relevant to the issues of the case, it must also be established that there was no opportunity for the declarant to "fabricate or to misrepresent his thoughts." United States v. Jackson, 780 F.2d 1305, 1315 (7th Cir. 1986)(quoting United States v. Layton, 549 F. Supp. at 909). The statements of intent must reveal information or details about the future, which has been contrasted with statements of memory, or looking back to the past. See Shepard v. United States, 290 U.S. 96, 104 (1933). When statements entail issues of looking into the past combined with other concerns, it can often be too confusing for a jury to extract, upsetting the balance of advantage, and ultimately making the evidence inadmissible. See Shepard v. United States, 290 U.S. at 104. "The most obvious risk of prejudice is that the jury will consider the hearsay statement not as proof of state of mind and the subsequent conduct of the declarant, but rather for the truth of the facts that are related in the statement." 4 Stephen A. Saltzburg,

Michael M. Martin & Daniel J. Capra, <u>Fed. Rules of Evidence Manual</u>, §803.02 at 4-803 (11th ed. 2017).

## <u>RELEVANT LAW REGARDING RULE 613</u>

The Federal Rules of Evidence allow the admission of a witness's prior inconsistent statements to impeach that witness. <u>See</u> Fed. R. Evid. 613(a). Further, the Tenth Circuit has repeatedly held that a witness' prior statements are admissible to impeach or discredit the witness. <u>See</u> <u>United States v. Carter</u>, 973 F.2d 1509 (10th Cir. 1992)(Brorby, J.); <u>United States v. Neal</u>, 452 F.2d 1085 (10th Cir. 1971)(Pickett, J.). These statements cannot be used, however, as substantive evidence, and the Court must instruct the jury that these statements can be considered only in evaluating the witness' credibility. <u>See</u> <u>United States v. Carter</u>, 973 F.2d at 1512. Attempting to introduce a prior inconsistent statement to impeach a witness may be seen as prejudicial when the prosecution is seeking to admit a statement that contains the defendant's alleged admission of guilt, but if "the defendant seeks to introduce a prior inconsistent statement for impeachment purposes, the dangers . . . are not implicated." <u>United States v. Buffalo</u>, 358 F.3d 519, 525 (8th Cir. 2004).

## <u>ANALYSIS</u>

The Court need not address rule 702 of the Federal Rules of Evidence, because the Parties' responses during the June 22 hearing indicate that Edwards will not elicit Armijo's testimony for her ability as an expert in the traditional ceremonies involving females in the Acoma Pueblo. The liberal definition of "expert" under rule 702 notwithstanding, Armijo still will be required to possess specific knowledge of the skill in question. In this case, Armijo will need to have a substantial foundation in the area of traditional Acoma healing ceremonies and their applicability to women in the culture. Edwards has not established that Armijo holds any

additional knowledge other than personal experiences with her own healing ceremonies that would make her qualified to testify as an expert. Accordingly, her testimony will not be permitted as expert testimony, but she may testify about her own experience using a medicine man. On the other hand, Edwards has requested that she not elicit that testimony, so the issue is moot.

Even though rule 803(3) allows a party to admit a statement showing a "declarant's then-existing state of mind," there is no precedent allowing statements into evidence that are so far removed as to not have a clear link between the statement given and the action in question. "While it is true that there is no bright line time limit for present sense impressions, it is also true that any statement made longer than a few minutes after a statement is quite unlikely to be admitted." 4 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Fed. Rules of Evidence Manual, §803.02 at 4-803 (11th ed. 2017). The alleged victim did not make her statement during the incident in question; rather, she made the statement at least two years before the incident. See June 22 Tr. at 184:5-21 (Ray). Although there is nothing to suggest that the statement must be made at the exact moment of the event, there is a requirement that, to prove intent, the statement be "contemporaneous" with the event that occurred. Mutual Life Ins. Co. of New York v. Hillmon, 145 U.S. 285, 295 (1892). The statement that V.S. made is not contemporaneous with the 2014 incident, and does not demonstrate either intent or a plan to then implicate someone years later. Despite V.S.' statement's relevance, her conversation in a car years before this incident occurred is not sufficiently proximate to fall under rule 803(3).

Even though the statement --"if I ever want to get even with him, I'll just call rape"-- is not admissible under rule 803(3), under rule 613, Edwards can ask V.S. whether she made the statement to Armijo. Motion at 2 (quoting Armijo Interview). See, e.g., Fed. R. Evid. 613

("When examining a witness about the witness's prior statement, a party need not show it or disclose its contents to the witness."); <u>United States v. Schnapp</u>, 322 F. 3d 564, 571 (8th Cir. 2003)(McMillian, J.)("The witness is afforded an opportunity to explain or deny the statement and the opposing party is afforded an opportunity to interrogate the witness about the statement."); <u>United States v. Neal</u>, 452 F.2d 1085, 1086-1087 (10th Cir. 1971)(Pickett, J.)("As a general proposition, the testimony of a witness, after a proper foundation has been laid, may be impeached by showing former declarations, statements, or testimony which are contradictory or inconsistent with the answers given at a trial.")(quoting <u>Brooks v. United States</u>, 309 F. 2d 580, 582 (10th Cir. 1962)) .  Under rule 613, prior inconsistent statements may be offered to impeach a witness as long as the material is shown to be part of the "substantive issues of the trial." <u>United States v. Buffalo</u>, 358 F.3d 519, 525 (8th Cir. 2004)("A witness may not be impeached on a collateral matter by the use of extrinsic evidence of prior inconsistent statements.")(quoting <u>United States v. Schnapp</u>).   When the statement is allowed under rule 613, the impeaching testimony can be used only to establish the trustworthiness of the trial testimony.  If the United States wants and requests, the Court will give a limiting instruction when Armijo says V.S. made the statement, telling the jury it cannot use the statement for the truth of the matter asserted, but only to judge V.S.'s credibility and truthfulness.   Here, the probative value of the prior inconsistent statement -- that she can "call rape" when she does not get what she wants -- is greater than unfair prejudice.   While it is unlikely that V.S. will admit that she made the statement, it would be explosive evidence if she admitted she had said it once.  This statement goes to the very core of the issues of the case, and V.S.'s credibility is one of the central issues. Edwards can offer that statement only for impeachment purposes.   The risk of endangering Edwards' liberty is therefore not an issue.

**IT IS ORDERED** that the United States' Sealed Motion in Limine to Exclude Katherine [sic] Armijo's Testimony, filed May 26, 2017 (Doc. 60), is granted in part and denied in part. The Court deems Catherine Armijo's testimony regarding V.S.' statement -- "if I ever want to get even with him, I'll just call rape" -- admissible only to the extent that it pertains to the impeachment of V.S. and her truthfulness as a witness. The Court excludes statements immaterial to the substance of the issues -- such as Armijo's expertise in the area of traditional healing practices of the Acoma Pueblo or her own opinion of V.S. "being nuts."

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James D. Tierney
   Acting United States Attorney
Nicholas James Marshall
Novaline Wilson
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Marshall J. Ray
Law Offices of Marshall J. Ray LLC
Albuquerque, New Mexico

--and--

Nicole Moss
The Law Office of Nicole W. Moss
Albuquerque, New Mexico

   *Attorneys for the Defendant*